**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRIGHTSTAR FRANCHISING, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | No. 17 C 9213 |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| NORTHERN NEVADA CARE, INC., | ) | |
| STEPHEN H. NEFF and TERESA R. NEFF, | ) | |
| | ) | |
| *Defendants.* | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff BrightStar Franchising, LLC ("BrightStar") filed this action against Defendants Northern Nevada Care, Inc. and its owners Stephen and Teresa Neff (collectively "NNC") seeking an order directing Defendants to cease operations of their business in Carson City, Nevada. (Dkt. No. 9.) Pending are BrightStar's Motion for a Preliminary Injunction and two Motions to Compel Arbitration. *See* (Dkt. No. 11); (Dkt. No. 37); (Dkt. No. 55). The Court grants all three motions for the following reasons. [11, 37, 55.]

## PROCEDURAL HISTORY

On December 21, 2017, BrightStar filed a one-count complaint for breach of contract seeking permanent injunctive relief against NNC, which it amended on January 12, 2018. *See* (Dkt. No. 1); (Dkt. No. 9). The claim arises out of a Franchise Agreement entered into by the parties in June 2015 containing various provisions that BrightStar now alleges NNC has violated. Shortly after filing the Amended Complaint, BrightStar filed its Motion for a Preliminary Injunction seeking an order temporarily halting operations of NNC's health services company – Allevia Living – in northern Nevada pending review of the underlying complaint. *See* (Dkt. No. 11); (Dkt. No. 12) (Plaintiff's Motion and accompanying Memorandum in support of a Preliminary

1

Injunction). On January 22, 2018, NNC moved to transfer the matter to a federal district court in Nevada, which this Court denied. *See* (Dkt. No. 20); (Dkt. No. 46). NNC subsequently answered the Amended Complaint on February 20, 2018 and followed with a Counterclaim against BrightStar alleging consumer fraud and common law fraud in violation of Nevada law on April 16, 2018. *See* (Dkt. No. 34); (Dkt. No. 48).

NNC filed its own Complaint in Nevada state court (the "Nevada Complaint") on January 12, 2018, against BrightStar alleging a claim similar to the Counterclaims for consumer fraud and common law fraud arising out of activities and events associated with the Franchising Agreement. *See* (Dkt. No. 38, at 1); *see also Northern Nevada Care, Inc., et al. v. BrightStar Franchising, LLC*, No. 18TRT000011B (1st Dist. Nev. 2018).[1] BrightStar moves to compel arbitration of the claim in the Nevada Complaint and the Counterclaims pursuant to the Federal Arbitration Act and corresponding provisions of the Franchise Agreement. *See* (Dkt. No. 37); (Dkt. No. 55).

On June 26, 2018, the Court held a preliminary injunction hearing during which the following witnesses testified: 1) Thomas Gilday ("Gilday"), chief financial officer of BrightStar Group Holdings, Inc.; 2) Peter Morris ("Morris"), owner and operator of the BrightStar franchise for the Reno-Sparks, Nevada territory; 3) Stephen Neff ("Neff"), co-defendant and owner of Allevia Living; and 4) James Kearns ("Kearns"), chief technology officer for BrightStar. The hearing provided the Court with the opportunity to determine the credibility of each witness through observation of their demeanors – including body language, tone of voice, facial expressions, mannerisms, and other indicative factors – as well as through the answers that each provided. Both parties also submitted post-hearing briefs in support of their positions on July 6 and 13, 2018, respectively. *See* (Dkt. No. 64); (Dkt. No. 65).

---

[1] A copy of the Nevada Complaint is attached as Exhibit A to Stephen Neff's Declaration in Support of Defendants' Motion to Transfer. *See* (Dkt. No. 21-1).

NNC narrowed the scope of its opposition to the preliminary injunction arguing two points: (1) BrightStar failed to show how it will suffer irreparable harm greater than that of the Defendant or to the public if the Court does not issue a preliminary injunction; and (2) BrightStar failed to show it is likely to prevail on the merits of its Amended Complaint. *See* (Dkt. No. 64, at 1.) For its part, BrightStar argues that is has shown both irreparable harm greater than that of Defendants or to the public, and also that it is likely to succeed on the merits of its Amended Complaint. *See* (Dkt. No. 65, at 2-5).

## FINDINGS OF FACT

### 1. The Parties

BrightStar is an Illinois-based company that franchises its name and business model related to companion care, personal care, skilled nursing, wound care, post-operative care, infusion therapy, and other various forms of home-based health related services to franchisees throughout 37 states.[2] *See* (Dkt. No. 66, at 14) (Testimony of Thomas Gilday). Those agency-based franchise agreements – referred to as territories – are made up of zip codes that meet various statistical identifiers suggesting the area has a population of at least 200,000 people and a certain number of residents over the ages of 65 and 85 years. *Id.*

Stephen and Teresa Neff co-own NNC, a company incorporated in Nevada, that entered into a franchise agreement with BrightStar in order to provide health-related homecare to "frail, vulnerable people in [their] community." *Id.* at 98 (Testimony of Stephen Neff); *see also* (Dkt. No. 9, at ¶ 12). Although the Franchise Agreement covered a franchisor/franchisee relationship between BrightStar and NNC, the Neffs personally guaranteed all NNC obligations under the

---

[2] Facts in this section derive from testimony provided by witnesses at the preliminary injunction hearing unless otherwise noted. Factual findings are based on the evidence presented in Court after weighing the credibility of each witness who testified. *See Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657-58 (7th Cir. 2006).

Franchise Agreement; essentially making them individual parties to this proceeding. *See* (Dkt. No. 9, at ¶ 12); (Dkt. No. 34, at ¶ 12). They currently operate a similar entity known as Allevia Living ("Allevia") in the same area where they previously operated the BrightStar franchise. *See* (Dkt. No. 66, at 168).

## 2. The Franchise Agreement

On June 2, 2015, NNC entered into a 10-year franchise agreement with BrightStar to operate as an in-home medical services provider in and around the area of Carson City, Nevada. *Id.* at 20; *see also* (Tr. Ex. 11).[3] The entire contract is incorporated as filed in the Amended Complaint and entered as an exhibit during the preliminary injunction hearing. *See* (Dkt. No. 9, at Ex. A; Tr. Ex. 11). Portions relevant to this litigation are reproduced below as follows:

> 1.2 **Operation of Franchise Limited to Territory; Incidental Advertising.** ... All clients serviced must be in Franchisee's Protected Territory and cannot be clients with service addresses, or services performed, in another Franchisee's Protected Territory held under a Franchise Agreement or a previously awarded Area Development Agreement. ...

> 1.3 **Cross-Territorial Service**
> Franchisor has established policies concerning soliciting and/or servicing clients in another franchisee's protected territory or development area or in a territory currently served by an Agency owned by Franchisor or an affiliate of Franchisor (the "Cross-Territorial Policy"). ...

*Id.* at 10-11. ...

> 11.2 **Confidential Information.** For purposes of this Agreement, "Confidential Information" means any information that the Franchisor regards as confidential or proprietary. "Confidential Information" includes, but is not limited to, the whole or any portion of know-how, knowledge, methods, specifications, processes, procedures and/or improvements relating to the BrightStar Agency Program, the Operations Manual, the methods of site selection, marketing methods, recruiting, service analysis and selectin, service

---

[3] Plaintiff's Trial Binder contains all exhibits utilized during the June 26, 2018 hearing and so will be the sole point of reference regarding trial exhibits. Reference to these materials will be cited as (Tr. Ex. ##), with any additional pin citation as necessary.

methods and skills, prospective and current customer information, employee information, and any other business information that is not generally known to the Franchisor's competitors, as well as the content of this Agreement and any other document executed in connection with this Agreement.

**11.3.  Non-Use   and   Non-Disclosure   of   Confidential Information.**  … Accordingly, Franchisee acknowledges that it will not, during the term of this Agreement or at any other time thereafter, use any Confidential Information for any purpose except to operate the Agency. …

**11.4    Non-Compete Covenants.**  Franchisee agrees that it will receive valuable training, goodwill, and Confidential Information that it otherwise would not receive or have access to but for the rights licensed to it under this Agreement.  Franchisee agrees to the following non-competition covenants:

…

3.      Franchisee covenants that it will not, for a period of eighteen (18) months after the … termination of this Agreement … either directly or indirectly, for itself, or though, on behalf of, or in conjunction with any person or entity, own manage, operate, maintain, engage in, consult with or have any interest in any Competing Business:

a.      At the premises of the former Agency;

b.      Within the Protected Territory of the former Agency; or

c.      Within 25 miles of any BrightStar agency or other BrightStar location, whether franchised or owned by Franchisor or its affiliates that would be considered a Competing Business.

4.      Franchisee covenants that it will not, for a period of eighteen (18) months after the … termination of this Agreement … solicit business from customers of the Franchisee's former Agency or from any National Accounts, or contact any of Franchisor's supplier or vendors for any competitive business purpose, or solicit any of its former Agency employees, or the employees of any agency operated by another franchisee, Franchisor or Franchisor's affiliates to discontinue employment.

*Id*. at 42-44. ...

> 14.1 **Obligations upon Termination or Expiration.** Upon the termination ... of this Agreement for any reason, Franchisee must immediately:
>
> 14.1.1 Cease to be a Franchisee or Franchisor under this Agreement and cease to operate the former Agency under the BrightStar Agency Program. Franchisee must not thereafter, directly or indirectly, represent to the public that the former Agency is or was operated or in any way to be connected with the BrightStar Agency Program or hold itself out as a present or former Franchisee or Franchisor.
> ...
> 14.1.5 Immediately cease using all telephone numbers and listing used in connection with the operation of the Franchised Business and direct the telephone company to transfer all such numbers and listing to Franchisor or Franchisor's designee pursuant to the Conditional Assignment of Telephone Numbers attached hereto as Exhibit I or, if Franchisor directs, to disconnect the numbers.

*Id*. at 52-53. ...

> 15.3 **Arbitration.** If not resolved by mediation and except as qualified below, any dispute between Franchisee and Franchisor or their respective affiliates arising under, out of, in connection with or in relation to this Agreement, the parties' relationship, or Franchisee's Agency must be submitted to binding arbitration in Gurnee, Illinois (or Franchisor's then-current headquarters) in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect. Any arbitration must be on an individual basis and the parties and the arbitrator will have no authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claim or any proceedings involving their parties. In the event a court determines that this limitation on joinder of or class action certification of claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts. The Federal Arbitration Act, as amended, will govern the rights and duties of the parties to this Agreement to resolve any disputes by arbitration.

*Id*. at 55. ...

> 15.8 **Venue.** The parties expressly agree to the exclusive jurisdiction and venue of any court of general jurisdiction in the city

> and state where Franchisor's headquarters are located at the time the action is filed ("Home State"), and the jurisdiction and venue of the United States District Court presiding over Franchisor's Home State. Franchisee acknowledges that this agreement has been entered into in the State of Illinois. …

*Id.* at 56. And finally, Exhibit G to the Franchise Agreement, titled "Acknowledgement Addendum To BrightStar Franchising, LLC Agency Franchise Agreement" includes the following:

> … The purpose of this Acknowledgment Addendum is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, and to be certain that you understand the limitations on claims that may be made by you by reason of the offer and sale of the franchise and operation of your business. Please review each of the following questions carefully and provide honest responses to each question.
> …
> 10. Do you understand that the Agreement and Disclosure Document contain the entire agreement between you and us concerning your BrightStar franchise rights, meaning that any prior oral or written statements not set out in the Agreement or Disclosure Document will not be binding? Check one: (√) Yes (_) No. If no, please comment: _____
> …
> YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO USE AND THAT WE WILL RELY ON THEM. BY SIGNING THIS ADDENDUM, YOU ARE REPRESENTING THT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS. …

*Id.* at 70-72.

**3. The BrightStar/NNC Franchise Relationship**

After signing the Franchise Agreement in June 2015, it took NNC became licensed in October and subsequently operational in December 2015. *See* (Dkt. No. 66, at 39, 103-104). During the set-up period in 2015 up to and through October 2017 NNC's Carson City franchise lost money with the Neffs investing over $300,000 of personal savings to keep the company operating. *Id.* at 104.

In July 2017, BrightStar informed NNC that its Carson City franchise had defaulted on the Franchise Agreement after receiving reports that NNC began servicing a patient in the neighboring Reno territory as early as October 2016. *Id.* at 39-41. As a result, BrightStar informed NNC in July 2017 that they would have to turn the patient-client over to the BrightStar Reno franchise – owned and operated by Peter Morris – and to pay restitution to the Reno franchise in the amount of $32,009.74. *Id.* at 40, 42.

Instead of paying restitution, NNC informed BrightStar that it was terminating its operations as a BrightStar franchise in October 2017. *Id.* at 42; *see also* (Tr. Ex. 12). Sent via email, the notice of termination – sent by Neff to Gilday – stated that NNC "ha[s] vacated our premises" and "all clients have successfully transitioned to other care providers." *See* (Tr. Ex. 12). BrightStar immediately sent NNC a notice terminating the Franchise Agreement on October 30, 2017. *Id.* Ex. 10. Sometime shortly thereafter BrightStar learned that NNC had opened a new in-home health care service provider by the name of Allevia Living. *See* (Dkt. No. 66, at 43-44). BrightStar filed the underlying Complaint seeking an order permanently enjoining NNC from operating Allevia Living upon learning that NNC was operating a separate entity in the Carson City in violation of the Franchise Agreement's non-compete and confidentiality provisions. *Id.* at 45; (Dkt. No. 1, 9).

## LEGAL STANDARD

Preliminary injunctions are a form of equitable, interlocutory relief – utilized only in cases demanding its application – implemented only after the district court engages in a two-part analysis: a threshold phase and a balancing phase. *See Girl Scouts of Manitou Council, Inc. v. Girls Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008). On a motion for a preliminary injunction a party must first show: (1) she will suffer irreparable harm in the interim

prior to a final resolution; (2) there is no adequate remedy at law; and (3) she has a reasonable likelihood of success on the merits. *Id.* at 1086; *see also Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). Upon making meeting the threshold, the court must next consider: (4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects that the grant or denial of the preliminary injunction would have on nonparties (or the "public interest"). *Id.*; *see also Turnell v. Centimark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015). The district court "weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell*, 796 F.3d at 662 (citing *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086).

The granting of a preliminary injunction is not a *per se* decision on the merits, it is "merely a decision that the suit has enough merit – which need not be great merit – to justify an order that will freeze the situation … for such time as it may take to determine whether the suit is, or is not meritorious." *Ayres v. City of Chicago*, 125 F.3d 1010, 1013 (7th Cir. 1997). Establishing a likelihood of success on the merits requires a movant to show a "greater than negligible chance of winning." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2007).

In determining whether to compel arbitration, the Court applies Illinois law and uses a similar standard as a motion for summary judgment in that the "opposing party must demonstrate that a genuine issue of material fact … exists. *See First Options of Chicago Inc.*, 514 U.S. 938, 944 (1995) (requiring application of state law); *see also Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002) (applying the summary judgment standard for motions to compel); *Bernardo v. J.D. Nicholas & Assoc., Inc.*, No. 13 CV 7085, 2014 WL 4913423, at *2 (N.D. Ill. 2014)

(Kendall, J.). The non-movant must show the existence of a triable issue of fact regarding the agreement to arbitrate in order to obtain a trial on the merits, and all of the non-movant's evidence should be believed, with inferences drawn in the non-movants favor. *Tinder*, 305 F.3d at 735.

Pursuant to the Federal Arbitration Act ("FAA"), "an agreement in writing to submit to arbitration ... shall be valid, irrevocable, and enforceable, save upon ground as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985); *James v. McDonald's Corp.*, 417 F.3d 672, 676 (7th Cir. 2005). The FAA's purpose was to "reverse the longstanding judicial hostility to arbitration agreements," and to bolster the notion that "[a]ny doubts with respect to arbitrability [] should be resolved in favor of arbitration," based upon Congress' intention to place agreements to arbitrate on the same level as other contracts. *James*, 417 F.3d at 676-77. Yet a "party can be compelled to arbitrate only those matters that she has agreed to submit to arbitration." *Id.* (citing *First Options of Chicago Inc.*, 514 U.S. at 945.

Under the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which ... would have jurisdiction under Title 28, in a civil action ... of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4; *see also Cent. States, Se. and Sw. Areas Pension Fund v. U.S. Foods, Inc.*, 761 F.3d 687, 688 (7th Cir. 2014). The FAA requires courts to stay or dismiss proceedings and to compel arbitration if an issue in controversy is covered by a valid arbitration agreement. 9 U.S.C. §§ 3, 4; *AT & T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1748 (2011).

## DISCUSSION

### I. Motion for a Preliminary Injunction

#### A. *Degree of Success on the Merits*

Under a preliminary injunction analysis, the Court considers first whether BrightStar is likely to succeed on the merits of its Amended Complaint. On the merits the Plaintiff seeks a permanent injunction based on allegations that the Defendant breached the Franchising Agreement to operate an in-home healthcare services company using BrightStar's name and business model in and around Carson City, Nevada. *See* (Dkt. No. 9). In response, the Defendants raised affirmative defenses including but not limited to fraudulent inducement based upon allegations that BrightStar made promises that never materialized in order to get NNC and the Neffs to sign the Franchise Agreement. *See* (Dkt. No. 34). NNC also filed a Counterclaim alleging consumer and common law fraud. *See* (Dkt. No. 48). Yet, both within the briefing and during the preliminary injunction hearing, the parties do not dispute the terms of the Franchise Agreement or that the Plaintiff and Defendants entered into the Franchise Agreement in June 2015. *See* (Dkt. No. 12, at 1); (Dkt. No. 50, at 7-8); (Dkt. No. 66, at 20, 122-23) (statements and admissions of both parties that they entered into the Franchise Agreement). They further agree that the preliminary injunction issue of success on the merits turns on whether BrightStar fraudulently induced the Neff's into signing the Franchise Agreement. *See* (Dkt. No. 64, at 1); (Dkt. No. 65, at 4).

This leaves determination of whether BrightStar has proven "a greater than negligible chance of winning" on the issue of whether there exists sufficient evidence of fraud to void the agreement. *See AM Gen. Corp.*, 311 F.3d at 804. Some degree of success on the merits of an affirmative defense of fraudulent inducement would potentially render the franchise agreement

void and the Court needn't reach its interpretation. *See, e.g. IFC Credit Corp. v. Utd. Bus. & Indus. Fed. Credit Union*, 512 F.3d 989, 994 (7th Cir. 2008) (the defense of fraud in the factum can void a contract). That said, when a claim or defense includes allegations of common law fraud or fraudulent activity, the party asserting the claim must plead with heightened particularity; including the 'who, where, what, how and why'-type facts necessary to succeed on the merits. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Svcs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008); *see also* Fed. R. Civ. P. 9(b). After reviewing the briefs and taking testimony BrightStar has shown a degree of success on the merits.

When raised as a defense, "for a misrepresentation to constitute fraud which invalidates a contract, it must be a representation in the form of a statement of a material fact, made for the purpose of inducing a party to act; it must be false and known by the party making it to be false, or not actually believed by him, on reasonable grounds, to be true; and the party to who it is made must be ignorant of its falsity, must reasonably believe it to be true, must act thereon to his damage, and in so acting must rely on the truth of the statement." *Cannon v. Burge*, 752 F.3d 1079, 1092-93 (7th Cir. 2014) (quoting *Wilkinson v. Appelton*, 28 Ill.2d 184, 190 (Ill. Ct. App. 1963). The problem for NNC here comes directly from statements made by Stephen Neff during the preliminary injunction hearing, and also from clear and unequivocal language of the Franchise Agreement.

The foundation of NNC's fraud defense and counterclaims is the allegation that BrightStar representative Tony Padulo orally promised Neff that NNC would receive BrightStar's Reno territory within the first six months after opening the Carson City franchise. *See* (Dkt. No. 50, at 6). During the preliminary injunction hearing, Neff testified that the entire plan from the start was that NNC would receive the Reno territory within the first six to nine months and further that

Padulo and Chris Connolly – another BrightStar representative – made oral promises to that affect.[4] *See* (Dkt. No. 66, at 99-100, 130-31). These assurances, Neff asserts, went unfulfilled and were made fraudulently to induce NNC into operating a BrightStar franchise in Carson City with no actual intention of taking over the Reno territory after six months. Neff further claims that he never would have entered into this Franchise Agreement without the promise of the Reno territory. *Id.* at 129-30 (Question: "…you wouldn't even have bought Carson City if you hadn't had Reno as well[?]" Answer: "Correct. Correct."). However, these statements contradict other actions and statements by Neff that draw into question his credibility.

For example, Neff's previous work experience was expansive, highly regarded, and well-established, and he states this was not the first 70-plus page contract he had dealt with before. *Id.* at 18 (testimony by Gilday expressing his regard for Neff's resume); *Id.* at 127 (Neff testimony stating experience with contracts); *see also* (Tr. Ex. 3, at 1-4) (S. Neff Resume). Furthermore, in reviewing the list of zip codes for the Carson City territory, Neff specifically requested that one zip code be added to the proposed territory (the one where he lived), while removing another zip code (for being a part of neighboring California) before entering into the Franchise Agreement. *See* (Dkt. No. 66, at 20, 128, 145). These actions suggest that Neff took time to review the Franchise Agreement and calls into doubt why he chose not to request any terms about the Reno territory if that was essential to the agreement.

Neff acknowledged that he could have reviewed the Franchise Agreement for almost two months prior to signing and returning it to BrightStar. *Id.* at 125-126. He further acknowledged the receipt, review, signature, and return of the entire Franchise Agreement, including Exhibit G to BrightStar. *Id.* at 136-38. Exhibit G to the Franchise Agreement, titled as an

---

[4] There is variation between Neff's deposition and the hearing as to whether the period of time promised was six months, or six to ninth months.

"Acknowledgement Addendum to BrightStar Franchising, LLC Agency Franchise Agreement,"
includes twelve statements that prospective franchisees must answer by checking a 'yes' or 'no'
before signing and dating the addendum. Question 10 specifically states "[d]o you understand that
the Agreement and Disclosure Document contain *the entire agreement between you and us*
concerning your BrightStar franchise rights, meaning that *any prior oral or written statements not
set out in the Agreement* or Disclosure Document will not be binding?" *See* (Tr. Ex. No. 11, at 70-
72) (emphasis added). Neff admits that he answered 'yes' to Question 10 along with expressing
regret to not taking more time to review the addendum. *See* (Dkt. No. 66, at 137).

Neff also admitted he previously engaged in the similar activity in a previous business
relationship where he entered into an agreement with an employer, who he claims made oral
promises that went unfulfilled, and that those oral promises were not a part of the written contract.
*Id.* at 147-48. In response to the question of whether he understood the importance of putting
things in writing when negotiating a contract Neff replied, "…in my experience contracts come
into play when things go very bad … If there is a strong relationship and the facts bear that out,
then … you may not need as detailed a contract." *Id.* Neff further admitted that he regrets not
having included certain oral representations before signing some of the Franchise Agreement
documents. *Id.* at 137-38. This suggests that Neff both felt comfortable with BrightStar, but also
that he understood from prior contract negotiations the importance of putting material terms of an
agreement in writing.

On the other hand, BrightStar CEO Thomas Gilday specifically noted that BrightStar
representatives were prohibited from making oral promises that fall outside of the Franchise
Agreement – a statement NNC failed to contradict during cross-examination. *Id.* at 27.

The evidence, in sum, more likely reflects a that Neff failed to review numerous portions of the Franchise Agreement, possibly signed documents in haste without taking the time to understand what they entailed, but who also very clearly understood other elements of the agreement important to him and who made certain those issues were addressed when necessary. The evidence also suggests that Neff acted to NNC's own detriment more so than someone who entered into an agreement on a false promise. In considering the heightened pleading standards for fraud, Neff's testimony starkly contrasts that given by any representatives of BrightStar regarding oral promises or Franchise Agreement discussions. The bulk of the evidence establishes nothing closely resembling the elements required to assert a defense or counterclaim of fraud necessary to assert a likelihood of success on the merits. As noted, BrightStar and NNC already agree to the existence of a Franchise Agreement and that any finding against NNC on a claim or defense fraud would suggest a likelihood of success on the merits for BrightStar's claim for breach of contract. Therefore, BrightStar has exhibited a "greater than negligible chance of success on the merits."

## B. *Irreparable Harm and Balancing*

Turning to the harm analysis, a party must not only prove the existence of, but also that the irreparable harm without a preliminary injunction outweighs the harm caused to the non-moving party or to the public. *Turnell*, 796 F.3d at 661-62. To establish irreparable harm, a party must demonstrate "that irreparable injury is likely in the absence [or issuance] of an injunction," and a preliminary injunction should never be issued based upon a mere possibility of irreparable harm. *See Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

### 1. Irreparable Harm

For a variety of reasons, BrightStar will suffer irreparable harm sans the issuance of an injunction. Particular irreparable harms that are ongoing and will continue unless the Court issues a preliminary injunction are BrightStar's inability to establish another franchise in the Carson City area, the damaged customer and business relationships, as well as harm in the form of lost proprietary information. Each harm directly impacts BrightStar's revenue stream presently and will continue to do so moving forward.

Turning to BrightStar's inability to refranchise, Gilday testified that BrightStar is unable to refranchise the Carson City market "until this issue is put to bed," referring to the dispute between BrightStar and NNC. *See* (Dkt. No. 66, at 49). He supported this claim based on "[BrightStar's] ethical approach to [its] franchise development process," because doing so would introduce a new franchisee into a market where another competitor that is aware of the BrightStar model is already in the market. *Id.* Under this theory Gilday believes it would be unfair to the new franchisee because it would be "setting them up for failure." *Id.* Of course, it follows that not being able to re-franchise in a given area will impact BrightStar's revenue stream.

Next, BrightStar suffers irreparable harm to business and client relationships through NNC's continued use of specialty pharmacies who they learned of through the National Accounts program that constitutes a part of BrightStar's business model. Stephen Neff testified that five separate specialty pharmacies contacted Allevia to discuss services after the change over from BrightStar. *Id.* at 111. He further admits that Allevia still uses a BrightStar National Account client – Dohmen – that he formerly worked with when he operated as a BrightStar franchise. *Id.* at 180. Furthermore, Neff admits that Allevia currently services around ten former BrightStar clients. *Id.* at 110. These continued relationships with BrightStar National Account clients and

with former BrightStar patients directly and indirectly harms BrightStar in both the loss of revenue as well as damage to its business model.

Finally, Gilday testified to the NNC's continued use of marks, trade names, phone numbers, and National Accounts contacts, as well as expansion into the Reno territory operating as Allevia Living. *Id.* at 50-51. Clearly, the use of this proprietary information, as well as direct competition to the BrightStar territory in Reno is in direct violation of the Franchise Agreement's non-compete and confidentiality conditions. *See* (Tr. Ex. 11, at 11, 42-44).

Taken together, these actions constitute a continuous and ongoing harm to BrightStar that will continue so long as NNC can operate Allevia in the Carson City and Reno territories. The harm is monetary, it is damaging to BrightStar's business model, and prevents BrightStar's ability to both re-enter the territory or maintain positive relationships with business partners and patients. These harms are likely to continue in the absence of a preliminary injunction.

2. Balancing of Harms

The Court must also weigh "the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction and consider whether an injunction is in the public interest. *Planned Parenthood of Ind. and Kent., Inc. v. Comm'r of Ind. State Dept. of Health*, 2018 WL 3567829, at \*4 (7th Cir. 2018). As previously noted, "the more likely the plaintiff is to win, the less heavily the need the balance of harms weigh in his favor." *Id.* (quoting *Valencia v. Cty. of Springfield*, 883, F.3d 959, 966 (7th Cir. 2018). In applying the Seventh Circuit standard, the Court relies less heavily on the balancing of the harms in the current matter given the strong likelihood of success on the merits of the Plaintiff's claim for breach of contract; however, the balancing of the harms further supports a preliminary injunction.

Clearly the irreparable harm to NNC is the forced termination of operations. See (Dkt. No. 50, at 15) ("If the preliminary injunction is granted, Defendants are out of business permanently"). The Neffs further alleges they will have individually lost about $500,000. *Id.* However, the Defendants admittedly elected out of the Franchising Agreement after being placed in default, and further opted to re-brand its business model under a different name – Allevia Living – all while violating the terms of the Franchise Agreement. *See* (Tr. Ex. 12); *see also* (Dkt. 21-1, at ¶ 27). However, "self-inflicted wounds are not irreparable injury." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 679 (7th Cir. 2012); *see also Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) (case-by-case determination should be whether an injury is readily avoidable and truly self-inflicted if not avoided). Furthermore, Neff has a work history that includes experience as a CFO and a CPA, while his wife was – at one time – a licensed nurse, and so it is not inconceivable that other forms of employment are available to them. See (Tr. Ex. 3) (S. Neff Resume); (Dkt. No. 66, at 98, 170). To the contrary, BrightStar cannot re-enter the Carson City territory during the pendency of this litigation. As such, the balancing between the parties weighs in favor of BrightStar.

In addition to the Defendants, the Court must also balance the irreparable harms with the public interest; including the impact of granting or denying a preliminary injunction on nonparties to the litigation. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1100. NNC argues that considerable harm will result to nonparties if the Court grants a preliminary injunction because patients belonging to Allevia will lose access to necessary medical care. See (Dkt. No. 50, at 3). This is simply not so.

The Court also heard testimony of Peter Morris – the owner and operator of the BrightStar Reno franchise – who stated that his company was well-equipped to take on any patients that

Allevia would lose in the event of a preliminary injunction. See (Dkt. No. 66, at 87-88). Neff opposed this assertion, arguing the importance of continuity of care by a single provider as necessary to patients who require in-home care. *Id.* at 107. But Neff's testimony is undercut by his actions in that he disrupted patient continuity in a similar fashion by changing NNC's operations from BrightStar to Allevia Living. Instead, as noted in testimony from Morris and Gilday, there are ample providers in the Carson City area that could care for the Allevia patients. *Id.* at 53, 70 (Gilday testimony); *Id.* at 89-90 (Morris testimony). Gilday listed a few such as Amanda Senior Care Northern Nevada, Home Instead Senior Care, Interim Healthcare of Northern Nevada, Senior Helpers, and Maxim Healthcare Services. *See* (Dkt. No. 13, at 28).

Based on the evidence before the Court, although there is assuredly some hardship placed upon nonparties in that they would have to transfer services, the harm does not outweigh the irreparable harm to BrightStar were the Court to deny a preliminary injunction. This conclusion is bolstered by the sliding-scale approach adopted by the Seventh Circuit because of the high likelihood of success on the merits here and so the Court places less weight on balancing the harms. *Turnell*, 796 F.3d at 662. Given the likelihood of success on the merits, the inadequate remedy available in equity or at law, and the irreparable harm that the Plaintiffs will suffer, the Court grants the preliminary injunction.[5] In ordering this preliminary relief, the Court turns to the motions compel arbitration given the impact that this preliminary injunction will have pending the resolution of the case.

---

[5] This decision holds only the existence of a negligible likelihood of success on the merits but does not fully address the merits of BrightStar's claim for breach of contract or NNC's counterclaims.

## II.    Motions to Compel Arbitration

As noted, there is no dispute that the parties entered into a 10-year Franchise Agreement on June 2, 2015. *See* (Dkt. No. 10, at Ex. A). There is also no dispute that the Franchise Agreement contained an arbitration clause, or to the validity or meaning of that clause, which states as follows:

> 15.3    **Arbitration.**    If not resolved by mediation and except as qualified below, any dispute between Franchisee and Franchisor or their respective affiliates arising under, out of, in connection with or in relation to this Agreement, the parties' relationship, or Franchisee's Agency must be submitted to binding arbitration in Gurnee, Illinois (or Franchisor's then-current headquarters) in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect. Any arbitration must be on an individual basis and the parties and the arbitrator will have no authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claim or any proceedings involving their parties. In the event a court determines that this limitation on joinder of or class action certification of claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts. The Federal Arbitration Act, as amended, will govern the rights and duties of the parties to this Agreement to resolve any disputes by arbitration.

*Id.* at 55.

BrightStar now seeks to compel arbitration in Illinois pursuant the terms of the Franchise Agreement of the claim asserted by NNC in a Nevada state court action for "Consumer Fraud." *See* (Dkt. No. 37); *see also Northern Nevada Care, Inc., et al. v. BrightStar Franchising, LLC*, No. 19TA000011 (1st Jud. Dist. Nev. 2018). They further seek to compel arbitration of NNC's Counterclaim in the underlying action.  *See* (Dkt. No. 55).  NNC opposes both motions on the following grounds: (1) the Court lacks diversity jurisdiction over the parties based on the amount in controversy and thus cannot compel arbitration; (2) only the Nevada courts have authority to compel arbitration in the pending Nevada state court action pursuant to state law; (3) BrightStar's

claims for injunctive relief are not subject to arbitration; and (4) granting a motion to compel arbitration requires the Court to stay the underlying Complaint seeking a permanent injunction pending the arbitrator's decision on the counterclaim of fraudulent inducement. *See generally* (Dkt. No. 47); (Dkt. No. 60). Yet many of these challenges are not suitable for judicial review; rather they are addressed through the arbitration process established by the FAA and precedent that binds the Court.

Faced with the question of whether to stay litigation or force arbitration, "courts should evaluate only the validity of the arbitration agreement" and "challenges to the validity of the entire contract – e.g., fraud in the inducement – should be left to the arbitrator." *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 741 (7th Cir. 2010) (citing *Prima Paint Corp. v. Flood & Conklin Manuf'g Co.*, 388 U.S. 395 (1967); *see also James v. McDonald's Corp.*, 417 F.3d 672, 680 (7th Cir. 2005). One exception to this approach occurs when a party challenges whether a contract ever existed prior to ordering a stay or compelling arbitration. *Buckeye Check Cashing, Inc. v. Cardengna*, 546 U.S. 440, 444 n.1 (2006). But the Defendants are not challenging the validity of the arbitration clause, nor are they challenging the valid formation of the Franchise Agreement; rather they argue that this Court lacks jurisdiction and question whether the Franchise Agreement covers the claims BrightStar seeks to arbitrate. As the Court has a continuing duty to examine its own jurisdiction, that issue is addressed below. *See U.S. v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 817 (7th Cir. 2013). Thereafter, the Court turns to the claims raised by BrightStar to ensure that they are subject to the arbitration clause within the Franchise Agreement. *AT & T Mobility LLC*, 563 U.S. at 344 ("pending arbitration of *those claims* in accordance with the terms of the agreement") (emphasis added) (quotations omitted) (citing 9 U.S.C. § 4).

*A. The Court's jurisdiction*

Pursuant to the FAA and 28 U.S.C. § 1332, the Court's subject matter jurisdiction of a motion to compel arbitration requires complete diversity of citizenship between the parties and an amount in controversy that exceeds $75,000. *See America's MoneyLine, Inc. v. Coleman*, 360 F.3d 782, 784 (7th Cir. 2004). As the Defendants are citizens of Nevada and the Plaintiff is a citizen of Illinois, the first element of § 1332 is satisfied. That being the case, NNC questions whether the amount in controversy in either the Nevada Complaint or in BrightStar's Amended Complaint satisfies the amount in controversy requirement. In the Nevada Complaint, NNC alleges $50,000 in damages and rescission of the Franchise Agreement, whereas BrightStar's Amended Complaint seeks no monetary damages – simply declaratory relief. However, "[i]n the context of actions to compel arbitration ... in order to ascertain whether the jurisdictional amount for the diversity statute has been met, the appropriate focus is the stakes of the underlying arbitration dispute." *Id.* at 786.

The Nevada Complaint seeks not only $50,000 as repayment of the franchise fee, but also rescission of the Franchise Agreement. *See* (Dkt. No. 49, at 4) (citing the Nevada Complaint). As BrightStar accurately points out, the damages at stake in any underlying arbitration of the state court claim includes $32,987.58 in "Royalty/Continuing Fees," as well as all "lost future royalties for the remaining term of the Franchise Agreement" that they argue go well beyond the claimed damages. *Id.* at 5. NNC's reliance on *Johnson* and *St. Paul Mercury Indemnity Co.* for the proposition that only the alleged damages listed in their Complaint is misguided. They both apply the proper standard that the complaint – as filed – must put more than the threshold amount in controversy at issue. *See Johnson v. Wattenbarger*, 361 F.3d 991, 993 (7th Cir. 2004) (The

complaint, as filed, must put the threshold amount in controversy at issue; and events after the suit is filed do not affect diversity jursidiction); *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938) (the complaint must establish the amount in controversy or else the court lacks jurisdiction). Yet neither of these cases concern arbitration, nor do they discuss this Court's jurisdiction to determine whether there exists federal jurisdiction to compel arbitration and the appropriate calculus for the amount in controversy in such matters requires the Court to look at the "stakes of the underlying arbitration dispute." America's MoneyLine, Inc., 360 F.3d at 786. Whether the Court includes the future royalties or not, the $50,000 in asserted damages and the $32,987.58 in "Royalty/Continuing Fees" alone surpass the threshold. As such, there is no question that the amount in controversy well exceeds the $75,000 threshold even were the arbitrator to side with NNC and simply award $50,000 in the state court action.

The same argument holds true for the request to compel arbitration of NNC's Counterclaims in the underlying litigation. The parties are citizens of different states and the stakes of the underlying arbitration dispute certainly exceed the $75,000 amount in controversy. Therefore, NNC's diversity theory fails and the Court maintains subject matter jurisdiction.

   *B. Requested claims for arbitration*

The claims BrightStar seeks to compel arbitration of the one claim asserted by NNC in the Nevada state court action for Consumer Fraud and of NNC's Counterclaims filed in this lawsuit. *See* (Dkt. No. 49, at 4-5). In order for the Court to compel arbitration, the claims must be covered by the Franchise Agreement's arbitration clause. More specifically, they must be "any dispute between Franchisee and Franchisor or their respective affiliates arising under, out of, in connection with or in relation to this Agreement, the parties' relationship, or Franchisee's Agency." *See* (Dkt. No. 10, Ex. A, at 55).

NNC's state court action alleges consumer fraud against BrightStar pursuant to Nevada's Deceptive Trade Practices Act and the Consumer Fraud Act. *See* (Dkt. No. 21-1, at 24) (copy of NNC's Nevada Complaint). "Plaintiffs reasonably relied upon the representations by BrightStar and its officers and agents ... by entering into and performing all obligations of NNC as set forth in the Franchise Agreement," and as a result they "are victims of consumer law fraud as the result of Defendants' conduct" and request "rescission of the Franchise Agreement ... and an award for judgment for repayment of the 50,000 franchise fee paid to BrightStar." *Id.* at ¶¶ 31, 40-42. These allegations fall within the scope of the Franchise Agreement's arbitration clause because they allege that BrightStar's fraudulent misrepresentations resulted in NNC entering into the Franchise Agreement. A claim that an agreement containing the arbitration clause procured by fraud is well within the scope of a broad arbitration clause such as the one in the Franchise Agreement. *See Prima Paint*, 388 U.S. at 406; *see also Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 643 (7th Cir. 1993). That the claim is before a Nevada state court and sites to violations of Nevada statute are of no concern because the Federal Arbitration Act requires such claims to be resolved in arbitration and permits a party to seek relief from an appropriate federal district court. *See* 9 U.S.C. §§ 3, 4.

Similar to the issue of jurisdiction, the counterclaims filed by NNC are mirrored claims raised in the Nevada state court action for consumer fraud and common law fraud pursuant to Nevada statute and common law. *See* (Dkt. No. 48, at ¶¶ 27-28, 38). Again, both claims allege misrepresentations that BrightStar allegedly made to NNC. *Id.* On their face, the allegations in the claims grow out of a "dispute between the Franchisee and Franchisor ... in connection with or in relation to [the Franchise] Agreement." Accordingly, the claims are also subject to arbitration

pursuant to the Franchise Agreement made between the parties and the applicable provisions of the FAA.

Finally, in its Response in Opposition to BrightStar's Motion to Compel Arbitration of the Counterclaim, NNC argued that a stay is necessary if the Court grants the Motions to Compel. *See* (Dkt. No. 60, at 1). But NNC makes this argument in its responsive pleading to a motion to compel, and further does not cite to any case law supporting the request or set forth the elements required to justify the granting of a stay pending arbitration. *See Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

## CONCLUSION

For the reasons stated, the Motion for Preliminary Injunction is granted. [11.] Defendants are hereby ordered (1) to immediately refrain from owning, managing, operating, engaging in, or having any interest in any business that provides (a) supplemental healthcare staff to institutional clients, such as hospitals, nursing homes and clinics, or (b) comprehensive care, including medical and non-medical services, to private duty clients within their home, within the following ZIP Codes: 89403, 89406, 89408, 89410, 89413, 89415, 89420, 89423, 89427, 89429, 89430, 89444, 89447, 89460, 89701, 89703, 89704, 89705, and 89706 or within 25 miles of the BrightStar franchised Agency located at 241 Ridge Street, Reno, Nevada and to continue refraining for a period of 18 months from the date that such refraining begins; (2) to immediately refrain from soliciting business from customers of NNC's former Agency or from any National Accounts and to continue refraining for a period of 18 months from the date that such refraining begins; (3) to immediately cease using the telephone number 775-461-3696 and all other telephone numbers and listings used in connection with the operation of Defendants' former BrightStar Agency and to take all steps necessary to assign to BrightStar or its designee the telephone number 775-461-3696

and all of other telephone numbers used in connection with the operation of their former BrightStar Agency; (4) to immediately refrain from using any Confidential Information for any purposes; (5) to immediately return to BrightStar the Confidential Information, and all trade secrets, confidential materials, and other property owned by BrightStar; (6) to immediately provide BrightStar a complete list of NNC's employees, clients, and contacts and their respective addresses and any outstanding obligations NNC may have to any third parties; and (7) to file with the Court and serve upon BrightStar and its counsel within ten days after entry of the preliminary injunction, a written report, under oath, setting forth in detail the manner in which Defendants have complied with such injunction.

Furthermore, the Motions to Compel Arbitration of the claims in the Nevada Complaint and NNC's counterclaims are also granted. [37, 55.]


_____
Hon. Virginia M. Kendall
United States District Judge

Date: September 4, 2018