IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRIGHTSTAR FRANCHISING, LLC, | ) |
|               *Plaintiff*, | ) 17 C 9213 |
| v. | ) Hon. Virginia M. Kendall |
| NORTHERN NEVADA CARE, INC., STEPHEN H. NEFF, and TERESA R. NEFF, | ) |
|               *Defendants*. | ) |

**MEMORANDUM OPINION AND ORDER**

In 2015, Plaintiff BrightStar Franchising, LLC and Defendants Northern Nevada Care, Inc., Stephen Neff and Teresa Neff entered into a Franchise Agreement whereby Defendants agreed to operate a franchised BrightStar agency in the Carson City, Nevada area, providing comprehensive at-home personal care and medical services to private duty clients and supplemental healthcare staff to institutional clients. (Dkt. 1). In December 2017, Plaintiff filed this action alleging Defendants violated the parties' Franchise Agreement and seeking preliminary and permanent injunctive relief against them. (*Id.*). On September 4, 2018, the Court entered a Preliminary Injunction Order requiring Defendants to, among other things, immediately cease operating any business that provides at-home personal care and medical services to private duty clients and supplemental healthcare staff to institutional clients in the Carson City area and to cease using any telephone number associated with the former BrightStar franchise. (Dkt. 67). Approximately one month late, Plaintiff filed a Motion for Rule to Show Cause as to why Defendants should not be held in contempt and sanctioned for failing to comply with the Court's Order. (Dkt. 84). Defendants, in turn, filed a Motion for Reconsideration of the Court's Order,

1

citing new facts that they argue warrant reversal of the Preliminary Injunction. (Dkt. 91). For the reasons below, BrightStar's Motion (Dkt. 84) is granted and Defendants' Motion for Reconsideration (Dkt. 91) is denied.

**BACKGROUND**

I. **Preliminary Injunction Hearing and Order**

On June 26, 2018, the Court held a preliminary injunction hearing at which the following witnesses testified: Thomas Gilday, BrightStar Chief Financial Officer; James Kearns, BrightStar Chief Technology Officer; Peter Morris, owner and operator of the BrightStar franchise in the Reno-Sparks, Nevada territory ("BrightStar Reno"); and Defendant Stephen Neff, owner of Allevia Living (successor to Defendants' former BrightStar agency). (*See* Dkt. 66). Following the hearing and based on the testimony presented and the parties' post-hearing briefs, the Court issued a Preliminary Injunction Order after finding for BrightStar on two grounds—the only grounds on which Defendants opposed BrightStar's Motion: that Brightstar sufficiently showed (1) it is likely succeed on the merits of its complaint and (2) absent a preliminary injunction, it would suffer irreparable harm outweighing any harm to Defendants or the public caused by the injunction sought. (Dkt. 67).

With regard to the latter, the Court found that contrary to Defendant Neff's contention, an injunction requiring Defendants to close their business would not cause Defendants' patients to lose access to necessary medical care based on both Morris's and Gilday's testimony at the hearing that there are ample providers in the Carson City area that could continue care for Defendants' patients, including but not limited to BrightStar Reno. (*Id.* at 18–19). Specifically, in a declaration submitted to the Court and at the hearing, Gilday testified that there are several competitors operating in the home health care and healthcare staffing industries in the Carson City and Reno

areas that would be willing to do whatever necessary to take on Defendants' high-margin clients if the preliminary injunction were imposed, including for example Amada Senior Care Northern Nevada, Home Instead Senior Care, Interim Healthcare Northern Nevada, Senior Helpers, and Maxim Healthcare Services. (Dkt. 13 at ¶ 28; Dkt. 66 at 69:22–70:17). Morris similarly testified that BrightStar Reno and Defendants had several competitors in the Reno and Carson City area:

> Q Are you familiar with competitors to Allevia Living in the Reno and Carson City areas?
>
> A I am.
>
> Q Who are some examples of competitors in the personal care space?
>
> A Companies, other franchises such as Home Instead, Right At Home, Comfort Keepers. Many others. Interim. And quite a few mom-and-pop individual operations as well, such as Lend A Hand.
>
> Q Who are some of the competitors in the Reno and Carson City areas in the skilled -- in the skilled care space?
>
> A Companies such as Renown, St. Mary's, Interim Home Care, Maxim, Gentiva. There are others, but those spring to mind.
>
> Q Would you describe this as a highly competitive industry in both the skilled care and the personal care space in the Carson City area?
>
> A I would say it's very competitive and getting more so every day.

(Dkt. 66 at 89:18–90:6). The Court considered and cited this specific testimony in deciding to issue the Preliminary Injunction Order. (Dkt. 67 at 18–19).

The Preliminary Injunction Order issued by the Court required Defendants to do the following:

> (1) to immediately refrain from owning, managing, operating engaging in, or having any interest in any business that provides (a) supplemental healthcare staff to institutional clients, such as hospitals, nursing homes and clinics, or (b) comprehensive care, including medical and non-medical services, to private duty clients within their home, within the following ZIP codes . . . or within 25 miles of [BrightStar Reno]; [and]
>
> . . .

> (3) to immediately cease using the telephone number 775-461-3696 and all other telephone numbers and listings used in connection with the operation of Defendants' former BrightStar Agency and to take all steps necessary to assign to BrightStar or its designee the telephone number 775-461-3696 and all other telephone numbers used in connection with the operation of their former BrightStar Agency . . . .

(*Id.* at 25–26).

## II. The Parties' Present Motions

Approximately one month after the Court issued its Order, Plaintiff filed its Motion for Rule to Show Cause. In the Motion, Plaintiff argued that Defendants were in violation of the Order because they still had not ceased using and/or assigned the telephone number 775-461-3696 to BrightStar or its designee and continued to provide care to private duty clients within the Carson City and Reno areas. (Dkt. 84). The Motion sought both an order requiring Defendants to show cause as to why they should not be held in contempt for failing to comply with the Court's Order and for the Court to impose sanctions against Defendants for their willful refusal to comply. In response, Defendants argued that its employees and patients had refused to associate with BrightStar Reno, which filed for Chapter 7 bankruptcy and went out of business after the Court's Order was issued, and that despite this, Defendants had reasonably complied with the Court's Order including by disconnecting the phone number, winding down its home health care operation and working to find new options for its employees and patients. (Dkt. 92).

Defendants also filed a Motion for Reconsideration of the Court's Preliminary Injunction Order pursuant to Federal Rule of Civil Procedure 60(b) based on "new facts"—namely that BrightStar Reno had filed for bankruptcy and gone out of business. (Dkt. 91). Defendants argue the Court's Preliminary Injunction Order should be reversed because the Court based its finding that the injunction posed no irreparable harm to the public on the declaration by Morris that

4

BrightStar Reno was able to take on Defendants' patients and employees—a fact which is no longer true given the bankruptcy. (*Id.*)

## IV. October 19, 2018 Evidentiary Hearing

On October 19, 2018, the Court held an evidentiary hearing on Brightstar's Motion. Neff and Gilday testified at the hearing regarding the two alleged violations of the Court's Order: (A) failure to cease using and to assign the 775-461-3696 telephone number and (B) failure to immediately cease all operations.

### A. Telephone Number

As to the issue with the 775-461-3696 telephone number, Neff testified that Allevia Living stopped using this number in early September when it cancelled its account with phone company Ooma. (Dkt. 96 at 27:5–11). Neff testified also that Ooma informed him that Allevia Living was not able to assign the number to BrightStar but that the number was available for BrightStar to acquire if it took the steps to do so. (*Id.* at 27:12–28:4). Neff testified that he then relayed this information and instructions for acquiring the number to BrightStar's counsel. (*Id.*).

Gilday then testified that on October 3, 2018, he called the 775-461-3696 number and Teresa Neff answered. (*Id.* at 40:1–6). Neff denied that anyone at Allevia Living was answering calls to the 775-461-3696 number after the account was cancelled in early September. (*Id.* at 28:5–12). Plaintiff argued that, regardless, the phone had clearly not been disconnected because, as Gilday testified, as of the date of the hearing the number still went to an answering machine from which Defendants could retrieve messages. (Dkt. 39:16–40:6). Neff again denied that Allevia Living has any control over the voicemail system now associated with the number or the ability to retrieve messages left at that number. (Dkt. 39:16–40:6). At the end of the hearing, the Court called the number and confirmed that it goes directly to a voicemail system that states only: "The

person at extension 1000 is unavailable, please leave your message after the tone, when done, hang up or press the pound key." (Dkt. 96 at 43:7–21).

**B.      Continuing Operations**

At the hearing, Neff repeatedly asserted that Defendants were actively working to fully comply with the Court's Order:

> A   [W]e're actively winding down our practice. . . . "[O]ur efforts are extensive to comply with the judge's order.
>
> . . .
>
> A   We're in a phase of ramping down the business. That's where all of our efforts are going. All of our efforts are going towards continuity of care for the patients with us not being the provider. That's where our time is going.
>
> . . .
>
> Q   Sir, have you tried to comply?
>
> A   Yes. Yes. Absolutely. We're working on it all the time and fully intend to comply.

(*Id.* at 8:13–17, 21:8–11, 34:2–18). Yet, Neff admitted also that Defendants were still operating Allevia Living (*id.* at 4:13–15, 8:13–18) and continued to provide in-home infusion services to about 30 patients. He testified further that since the Court issued its Order, Defendants had transitioned only "[p]ossibly ten" patients to other providers. (*Id.* at 8:19–9:3).

Neff claimed that Defendants were unable to stop providing infusion services because no other providers are available to continue care for these patients. Neff testified that competing agencies—such as Renown, St. Mary's, Gentiva and others identified in the preliminary injunction hearing—lacked either the skilled-care license, trained nursing staff, credentials with specialty pharmacies, or contracting capabilities necessary to provide infusion services. (*Id.* at 9:4–10:11; 12:24–13:18; 33:5–8). Neff claimed, therefore, that it could not comply with the Court's Order immediately because the only way to transition patients away from Allevia Living is to have each

patient's nurse reemployed with a competing agency that would then need to obtain necessary credentials, a process which he claimed would take six months:

> Q Ultimately, the nurses are the ones that provide the care, correct?
>
> A Yes.
>
> Q And in order for the nurses to continue on, they would have to find a new employer to work under -- new employer with the credentialing of the pharmacies to maintain the continuum of care, correct?
>
> A That is correct, yes.
>
> Q Is there any other provider in Northern Nevada that has that credentialing where the nurses can go to work for them and continue the care with these patients?
>
> A None. No.
>
> Q Okay. So was it possible to comply with the literal terms of this ruling without abandoning these patients?
>
> A [I]t was not possible.
>
> . . .
>
> Q And what is preventing you from following the literal terms of the injunction?
>
> A To go to our nurses and -- well, nurses will not pull off a patient. It doesn't happen. What is preventing me from complying with the literal terms of the injunction is that it is a process that can take six months to have the nurses reemployed with another provider, which we're doing, and then to move those patients over, and then to complete all the credentialing and recontracting that has to happen. So it -- it is not something that can possibly be done immediately. It is something that can be done over a six-month period.

(*Id.* at 32:22–33:11, 34:7–18).

Gilday refuted Neff's claims and, consistent with his testimony at the preliminary injunction hearing, testified that competing agencies in the area are capable of and do provide infusion services:

> Q Are you aware of other providers in the market that are able to provide infusion services in the Carson City and Reno area?

> A Yes. There are other -- Gentiva has the capabilities. They market those capabilities. And they can do infusions and do infusions with some of our national account providers.

(*Id.* at 39:10–15).

Plaintiff's counsel also questioned Neff as to whether specialty pharmacies, which are distinct from the competing agencies, could also serve as alternative providers of at-home infusion services. Contrary to the testimony cited above, Neff admitted that such alternative option exists, whereby no competing agency is involved because both a nurse and patient are transferred directly to a specialty pharmacy to continue care; he admitted, however, that he had not personally looked into this possibility for the purpose of complying with the Court's Order:

> A . . . There are sometimes opportunities where the nurse can go to the specialty pharmacy to -- for the nurse to continue to serve that patient.
>
> Q Have you called every specialty pharmacy that is the referral source for each of those 30 patients to determine if you can transition to the specialty pharmacy?
>
> A I have not called any of the specialty pharmacies. That is handled by the nurses, and that is a nursing issue, to be able to -- to -- if it's possible, to transfer both the nurse and the patient to the specialty pharmacy. So I have not been involved in those calls.
>
> Q Have you instructed the nurses to call the specialty pharmacies to identify if the services can be transitioned through them?
>
> A Yes.
>
> . . .
>
> Q What stopped you from making that phone call?
>
> A I didn't have the relationship. That's a – that's a nurse/case manager relationship.

(*Id.* at 10: 12–24). Neff did not specify which or how many nurses he had instructed to inquire about transitioning care to a specialty pharmacy or whether any nurses followed his direction and, if so, to what effect.

When pressed, Neff also admitted that specialty pharmacies proactively and independently find services for patients when no agency is available to provide the necessary care. He admitted further that, in his opinion, Defendants likely would ultimately need to transition patients to specialty pharmacies in order to comply with the Court's Order but, again, that he failed to take any steps since the Court issued its Order to facilitate such transitions:

> Q  Is one of the ways that specialty pharmacies find services for their patients by using per diem nurses that are outside of an agency?
>
> A  Right, that is typically a very last resort for a specialty pharmacy. It does happen. That pharmacy would need some sort of provider license in order to be able to do that. So that is a very last resort.
>
> Q  Is that available to Briova RX, Accredo, or Dohman?
>
> A  Accredo, possibly. I don't know -- I know it's not available to Dohman. And Briova, I don't know.
>
> Q  You haven't investigated whether or not this is a possible way of complying with the injunction?
>
> A  No, I have investigated that. And I think when all is said and done, that may be a bigger part of the resolution to the judge's order, but -- that I think is a serious thing that we're investigating.
>
> Q  How long will it take you to investigate that?
>
> A  I am hoping that we have fully complied with the judge's order by the end of this year. 2018.
>
> Q  By December 31st, 2018?
>
> A  Yes.

(*Id.* at 36:6–37:1).

During his testimony, Gilday confirmed that specialty pharmacies offer another available alternative source of care for Defendants' patients and would pay nurses directly to provide infusion services to if, in fact, no agency were available to do so:

> A  . . . [V]ery often in markets where there aren't BrightStar agencies, the specialty pharmacy will pay nurses travel time to go great distances if their health -- if

9

> the health of that patient is, in fact, so dependent upon getting that infusion or getting those infusion -- that infusion therapy. So we have instances in other parts of the country where BrightStar agencies are having nurses travel an hour, two hours, three hours, and the specialty pharmacies reimbursing the nurse for her travel time in addition to the fee that's associated with doing the infusion. So I find it very hard to believe that if Mr. Neff was to cease his operations that those specialty pharmacies that he mentioned wouldn't be able to find infusion nurses in other markets that would be willing to be paid $60 an hour travel time to go to do an infusion or infusion case.

*Id.* at 38:21–38:9.

## DISCUSSION

**I.     Motion for Rule to Show Cause**

"The court's power to enforce its order by civil contempt rests in its inherent limited authority to enforce compliance with court orders and ensure judicial proceedings are conducted in an orderly manner." *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 757 (7th Cir. 2008). To prevail on its request for a contempt finding, Plaintiff "must establish by clear and convincing evidence that (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply." *S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010).

**A.     Telephone Number**

The Court's Order unambiguously required Defendants to "immediately" cease using the telephone number 775-461-3696 and to take all reasonable steps necessary to assign that number to BrightStar or its designee. BrightStar failed to present clear and convincing evidence that Defendants failed to substantially comply with this Order. Neff testified that in early September, Defendants cancelled the phone company account associated with the 775-461-3696 number, were told by the phone company that BrightStar would have to act to acquire that number, and sent instructions to BrightStar's counsel that the number was available for Morris to acquire on

10

BrightStar's behalf. (Dkt 96 at 27:5–28:12). In turn, BrightStar offered only Gilday's testimony that he called the number on October 3 and that Teresa Neff answered, which Neff denies. (*Id.* at 40:1–6). BrightStar does not dispute that Neff sent notice that the number was available or argue that it attempted but was unable to acquire that number. Additionally, when the Court called the number during the hearing, it went directly to a voicemail service and there was no indication that either the number or the voicemail account was controlled by or associated with Defendants. Therefore, the Court denies BrightStar's motion to find Defendants in contempt with regard to its use of the telephone number.

B. **Continuing Operations**

The Court's Order was also unambiguous in requiring Defendants to "refrain from owning, managing, operating engaging in, or having any interest in any business that provides . . . comprehensive care, including medical and non-medical services, to private duty clients within their home" in the Carson City and Reno area. Defendants violated that command by continuing to provide at-home infusion services to 30 private clients. Now—only after Plaintiff filed its Motion and the Court ordered that Defendants show cause as to why they have failed to comply with the express terms of the Court's Order—Defendants claim compliance with the Court's Order was impossible. Yet Defendants never notified the Court after the Order was entered that it was having any difficulty complying. In fact, ten days after the Order was issued, Defendants filed a Declaration asserting that Allevia Living understood its obligations under the Order. (Dkt. 71). Then, more than two weeks after the Order was issued, Defendants filed a Motion for a Stay pending appeal on the grounds that immediate closure of the business would cause harm to Defendants and their employees and *not once* notifying the Court that Defendants were actually

unable to transfer patients to other providers—a process that, if Defendants had been attempting to comply with the Court's Order, should have been well underway at that time. (Dkt. 77).

What is clear from the evidence presented at the October 19 hearing is that, contrary to Defendants claims that they have been focusing all efforts on winding down their business, they in fact have taken no meaningful steps toward transitioning patients to new care providers. Neff's claims that immediate transitions are impossible is not credible and was entirely refuted by Gilday's testimony and Neff's own admissions at the hearing. Most importantly, Neff admits that specialty pharmacies can provide infusion services even absent an agency-provider and that specialty pharmacies are likely a necessary part of the solution for complying with the Court's Order yet Defendants have refused to even investigate this solution, let alone take meaningful steps toward facilitating the transition of patients to specialty pharmacies.

The Court previously found that the preliminary injunction would not cause Defendants' patients to lose access to necessary medical care because sufficient providers exist to provide that care in Defendants absence. As Gilday's and Neff's testimony demonstrate, the same is still true. Defendants are required by Court Order to take steps necessary to immediately cease operations and this includes transitioning patients to alternative providers, be that competing agencies or specialty pharmacies. Instead, Defendants unilaterally decided to ignore an explicit Court Order. Defendants, therefore, have failed to make a reasonable and diligent effort to comply. Such disregard for Court orders warrants a finding of contempt.

Having found Defendants in contempt, the Court must determine an appropriate sanction. Civil contempt sanctions "are properly imposed for two reasons: to compel compliance with the court order and to compensate the complainant for losses caused by contemptuous actions." *Pearle Vision*, 541 F.3d at 757 (quoting *Dowell*, 257 F.3d 694, 699 (7th Cir. 2001)). "Coercive sanctions

seek to induce future behavior by attempting to coerce a recalcitrant party or witness to comply with an express court directive." *Dowell*, 257 F.3d at 699 (quotation omitted). "Remedial sanctions, by contrast, are backward-looking and seek to compensate an aggrieved party for losses sustained as a result of the contemnor's disobedience." *Id.* (quotation omitted). "Also, attorney's fees may be awarded in contempt proceedings at the court's discretion." *Tranzact Techs., Inc. v. 1Source Worldsite*, 406 F.3d 851, 855 (7th Cir. 2005). "When considering an appropriate sanction for a party in contempt, the guiding principle is proportionality." *APC Filtration, Inc. v. Becker*, No. 07-CV-1462, 2010 WL 4930688, at *1 (N.D. Ill. Nov. 30, 2010) (citing *Crown Life Ins. Co. v. Craig*, 995 F.2d 1376, 1382 (7th Cir.1993)).

BrightStar claims generally that it "suffers harm" as a result of Defendant's failure to comply with the Order but has not sought any specific monetary amount in remedial sanctions. Therefore, the Court declines to award any. However, to prevent further violation of the Court's Order, Defendants must file a status report by January 23, 2019 notifying the Court that it has fully complied with the Court's Order, including by transitioning all patients receiving at-home infusion services to alternative care providers. Failure to do so may result in a fine to be determined at that time, in necessary. Additionally, Defendants must also pay Plaintiff its reasonable attorneys' fees and costs incurred in the rule to show cause and contempt proceedings.

II.     **Motion for Reconsideration**

Defendants request that the Court reconsider and reverse its Preliminary Injunction Order pursuant to Federal Rule of Civil Procedure 60(b). (Dkt. 91). Rule 60(b) permits a party to seek relief from a judgment or order on various grounds including "newly discovered evidence." Fed. R. Civ. 60(b)(2). "Rule 60(b) relief is an extraordinary remedy and is granted only in exceptional circumstances." *Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006) (quoting

13

*Karraker v. Rent–A–Center, Inc.*, 411 F.3d 831, 837 (7th Cir.2005)). Defendants argue that "Plaintiff persuaded this Court to grant the [preliminary injunction] order based on the misrepresentation that Brightstar Reno was ready, willing and able to take on Defendants' patients and employees" (Dkt. 91 at 3) and, therefore, the Court would not have issued the Order had BrightStar Reno already been closed and filed for bankruptcy at the time of the hearing. The record simply does not support this argument. Morris's testimony that BrightStar Reno could serve Defendants' patients was just one consideration of many supporting the Court's ruling. Most importantly, the Court cited to and emphasized evidence demonstrating that "ample providers" in the area—and, therefore, not solely BrightStar Reno—could provide care for Allevia Living's patients once the injunction took effect. This finding was supported not only by Morris's testimony but also by Gilday, who has consistently and credibly testified at the preliminary injunction hearing and at the rule to show cause hearing that such alternative providers exist. Because Defendants' "newly discovered evidence" would not have led to a default result, the Court denies the motion for relief under Rule 60(b). *See Christiansen v. Inman*, 98 F. App'x 521, 525 (7th Cir. 2004) (Rule 60(b)(2) requires a showing that newly discovered evidence "would probably result in a different outcome").

**CONCLUSION**

For the reasons stated above, BrightStar's Motion for Rule to Show Cause (Dkt. 84) is granted. The Court finds Defendants in civil contempt. Defendants must file a status report consistent with the Court's direction as explained above by January 23, 2019. The Court also awards Plaintiff reasonable attorneys' fees and costs incurred in the rule to show cause and contempt proceedings. Finally, Defendants' Motion for Reconsideration (Dkt. 91) is denied.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: January 15, 2019