# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BRIGHTSTAR FRANCHISING, LLC, | ) |
| *Plaintiff*, | ) No. 17 C 9213 |
| v. | ) Judge Virginia M. Kendall |
| NORTHERN NEVADA CARE, INC., STEPHEN H. NEFF and TERESA R. NEFF, | ) |
| *Defendants*. | ) |

## MEMORANDUM OPINION AND ORDER

In June 2015, Defendant Northern Nevada Care, Inc. ("NNC") and its owners, Stephen and Teresa Neff, entered into a franchise agreement with BrightStar Franchising, LLC to operate a BrightStar franchise providing home-health care in the Carson City, Nevada area. Defendants later terminated the agreement and began operating a competing business in the same location. BrightStar sued for breach of contract claiming that the Neffs' new business violated multiple terms of the franchise agreement. BrightStar now moves for summary judgment on its breach of contract claim and asks the Court to enter a permanent injunction requiring Defendants to comply with certain terms of the franchise agreement. For these reasons, the Court grants BrightStar's motion for summary judgment [Dkt. 141] and enters a permanent injunction as set forth below.

## PROCEDURAL HISTORY

On December 21, 2017, BrightStar filed a one-count complaint for breach of contract seeking injunctive relief against NNC, which it amended on January 12, 2018. (Dkt. 1, 9.) Shortly after filing the amended complaint, BrightStar filed a motion for a preliminary injunction seeking an order temporarily halting operations of NNC's health services company, Allevia Living, in

1

northern Nevada pending review of the underlying complaint. (Dkt. 11, 12.) On January 22, 2018, NNC moved to transfer the case to federal district court in Nevada, which the Court denied. NNC answered the amended complaint on February 20, 2018 and brought a counterclaim against BrightStar alleging consumer fraud and common law fraud in violation of Nevada law on April 16, 2018. (Dkt. 34, 48.)

On January 12, 2018, NNC filed its own complaint against BrightStar in Nevada state court (the "Nevada Complaint") bringing a claim similar to the counterclaims here for consumer fraud and common law fraud arising out of activities and events related to the franchise agreement. (Dkt. 21-1, Dkt. 38 at 1); *see also Northern Nevada Care, Inc., et al. v. BrightStar Franchising, LLC*, No. 18TRT000011B (1st Dist. Nev. 2018). BrightStar moved to compel arbitration of the claim in the Nevada Complaint and the counterclaims in this case under the Federal Arbitration Act and corresponding provisions of the franchise agreement. (Dkt. 37, 55.) The Court granted BrightStar's motion to compel and ordered that the claim in the Nevada Complaint and Defendants' counterclaims be resolved in arbitration. *BrightStar Franchising, LLC v. N. Nev. Care, Inc.*, No. 17 C 9213, 2018 WL 4224454, at *10-13 (N.D. Ill. Sept. 4, 2018) ("*BrightStar I*").

On June 26, 2018, the Court held a preliminary injunction hearing and heard testimony from: 1) Thomas Gilday, chief financial officer of BrightStar Group Holdings, Inc.; 2) Peter Morris, owner and operator of the BrightStar franchise for the Reno-Sparks, Nevada territory; 3) Stephen Neff , co-defendant and owner of Allevia Living; and 4) James Kearns, chief technology officer for BrightStar. On September 4, 2018, the Court granted BrightStar's preliminary injunction motion, finding first that BrightStar was likely to succeed on the merits of its breach of contract claim. *Id.* at *6. The Court noted that Defendants did not dispute any of the elements of BrightStar's breach of contract claim and instead relied entirely on a fraudulent inducement

defense, which the Court rejected. *Id.* at *6-7. The Court also found that BrightStar would be irreparably harmed without a preliminary injunction and that the balance of harms supported injunctive relief. *Id.* at *8-9. The Court ordered Defendants, among other things, to cease operating a business related to home healthcare or healthcare staffing in the Reno, Nevada area for a period of 18 months and to cease using a telephone number affiliated with Defendants' former BrightStar franchise. *Id.* at *13. Defendants appealed the Court's preliminary injunction order, and the Court declined Defendants' request to stay the order while the appeal was pending. (Dkt. 74, 95.) Defendants later voluntarily dismissed the appeal. *See BrightStar Franchising, LLC v. N. Nev. Care, Inc.*, No. 18-2994, 2018 WL 7821524, at *1 (7th Cir. Nov. 21, 2018).

On October 3, 2018, BrightStar asked the Court to sanction Defendants and hold them in contempt for failing to comply with the preliminary injunction order. (Dkt. 84-88.) Defendants, in turn, filed a motion to reconsider the Court's preliminary injunction order, citing new facts they argued warranted reversal of the injunction. (Dkt. 91.) The Court held an evidentiary hearing on BrightStar's motion on October 19, 2018 and heard testimony from Stephen Neff and Thomas Gilday about two violations of the preliminary injunction order—Defendants' failure to cease business operations and failure to cease using the former BrightStar telephone number. *See BrightStar Franchising, LLC v. N. Nev. Care, Inc.*, No. 17 C 9213, 2019 WL 194369, at *3-6 (N.D. Ill. Jan. 15, 2019) ("*BrightStar II*"). The Court denied Defendants' reconsideration bid, granted BrightStar's motions, found Defendants in contempt of the Court's preliminary injunction order, and ordered Defendants to pay BrightStar's attorneys' fees and costs related to the rule to show cause and contempt proceedings. *Id.* at *6-7.

The parties engaged in discovery and BrightStar filed this motion for summary judgment. (Dkt. 141.) Defendants oppose the motion and the Neffs are now proceeding *pro se*.

## STATEMENT OF FACTS

**I.      The Neffs' Response to BrightStar's Motion**

The Court must begin by addressing the Neffs' response to BrightStar's motion for summary judgment. The Neffs, who are proceeding *pro se*, filed a 17-page memorandum of law and 22 exhibits responding to BrightStar's motion for summary judgment. (Dkt. 147.) The memorandum of law includes a section titled "Factual History" containing 40 separate statements of fact, a 2-page argument section titled "Injunctive Relief," and a 2.5-page argument section titled "Summary Judgment."

The Neffs' response does not include anything directly addressing BrightStar's statement of material facts. There is nothing in their memorandum of law responding to BrightStar's facts, nor is there a separately filed statement as required by the Court's local rules. Local Rule 56.1(b)(3)(A)-(B) requires the party opposing summary judgment to respond to the moving party's statement of facts with "a concise response . . . that shall contain:

>   (A) numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed, and
>
>   (B) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon."

*See also Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 816-18 (7th Cir. 2004). The Neffs did not file anything addressing BrightStar's statement of facts, let alone a response in the form required by Local Rule 56.1.[1] Because the Neffs failed to respond to or dispute any of

---

[1] BrightStar filed a Notice to Pro Se Litigant Opposing Motion for Summary Judgment, as required by Local Rule 56.2. (Dkt. 144.) The notice explicitly informed the Neffs that:

>   Your response must comply with Rule 56(e) of the Federal Rules of Civil Procedure and Local Rule 56.1 of this court. These rules are available at any law library. Your Rule 56.1 statement needs to have numbered paragraphs responding to each paragraph in the plaintiff's statement of facts. If you disagree with any fact offered by the plaintiff, you need to explain how and why you disagree with the plaintiff. You also need to explain how the

BrightStar's material facts, those facts are deemed undisputed and admitted for purposes of summary judgment. *Id.*; *see also, e.g.*, *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015) ("The non-moving party's failure to admit or deny facts as presented in the moving party's statement . . . render[s] the facts presented by the moving party as undisputed"); Local Rule 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.")

The Neffs' statement of additional material facts is also deficient in multiple ways. The Court could disregard the Neffs' additional facts solely because the Neffs failed to submit them in a separate statement as required by Local Rule 56.1 and instead included them as part of their memorandum of law responding to BrightStar's motion. *See, e.g.*, *Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809-810 (7th Cir. 2005) (district court did not abuse its discretion by disregarding non-moving party's additional facts set forth in a response brief rather than a separate statement in the form required by Local Rule 56.1). Still, despite the errors in form, the Court reviewed each factual assertion the Neffs included in their brief. Many of them fail because the Neffs did not include any citation to the record. When a non-moving party submits additional facts they contend require denial of summary judgment, those additional facts must be supported by "references to the affidavits, parts of the record, and other supporting materials relied upon." *See* Local Rule 56.1(b)(3)(C). The Court disregards the Neffs' facts that are not supported by citations to the record (*i.e.*, ¶¶ 1, 2, 4, 10, 13-17, 19, 25-26, 28,[2] 29-31, 37-40). *Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 710-11 (7th Cir. 2015) (disregarding facts contained in non-

---

documents or declarations that you are submitting support your version of the facts. If you think that some of the facts offered by the plaintiff are immaterial or irrelevant, you need to explain why you believe that those facts should not be considered.

(*Id.*)

[2] There are two different facts numbered 28 in the Neffs' response. The Court disregards the "first" fact 28, which appears between facts 24 and 25, because it does not include a citation to the record.

moving party's statement of additional facts that were not supported by proper citations to the record). There are also instances where the Neffs' facts do include citations to the record, but the material cited does not actually support the proposed fact. Those facts have been disregarded as well (*i.e.*, ¶¶ 5-6, 11-12, 34).

To the extent the Neffs' facts are relevant to the summary judgment motion and supported by citations to the record, they have been included in the recitation of facts below. Otherwise, they have been disregarded for the reasons outlined here.

## II. Facts

The Court takes the relevant facts from the parties' statements of undisputed material facts and supporting exhibits, with the limitations outlined above. The following facts are relevant, supported by the record, and undisputed.

### a. Peter Morris's Reno Franchise

BrightStar is an Illinois-based company that franchises its name and business model related to companion care, personal care, skilled nursing, wound care, post-operative care, infusion therapy, and other various forms of home-based health-related services to franchises in 37 states. *BrightStar I*, 2018 WL 4224454, at *1. In April 2015, Defendant Stephen Neff had a series of discussions with BrightStar representatives about purchasing a BrightStar franchise in the Reno, Nevada area which was then owned and operated by Peter Morris. (Dkt. 147 ¶ 3; Dkt. 147-2.) Neff drafted a Letter of Intent, dated May 1, 2015 and addressed to Morris, regarding Neff and his wife's potential purchase of Morris's BrightStar franchise in Reno. (Dkt. 147 ¶ 7; Dkt. 147-4.) On May 5, 2015, Morris informed Neff that the asking price for Morris's franchise was $525,000.

(Dkt. 147 ¶ 9; Dkt. 147-6.) Neff responded and asked if Morris's asking price was a typo; Morris informed him that it was not. (*Id.*)

      **b.**      **The Parties' Franchise Agreement**

On June 2, 2015, BrightStar and NNC (the Neffs' company) entered into a written franchise agreement (the "Franchise Agreement" or "Agreement"), under which BrightStar granted NNC a 10-year license to operate a BrightStar franchise in the Carson City, Nevada area. (Dkt. 143 ¶ 7.) At the same time, Stephen Neff (who owned a 49% interest in NNC) and Defendant Teresa Neff (who owned a 51% interest in NNC) entered into an agreement to guarantee and be personally bound by all of NNC's obligations under the Franchise Agreement, including the non-competition covenants. (*Id.* ¶ 10; *see also* Dkt. 143-5 at 71.)

      **c.**      **Non-Competition and Post-Termination Provisions**

In the Franchise Agreement, NNC and the Neffs (together, "Defendants") agreed they would not operate a "competing business" for 18 months after the termination of the Agreement. (Dkt. 143 ¶ 12; *see also* Dkt. 143-5 at 46, § 11.4(3).) The geographic scope of the non-competition provision provides that Defendants may not operate a competing business at the premises of the former BrightStar franchise location, within any of BrightStar's "protected territory," or within 25 miles of any other franchised or company-owned BrightStar location. (*Id.*) The Franchise Agreement defines "competing business" as any business that provides "(a) supplemental healthcare staff to institutional clients, such as hospitals, nursing homes and clinics" and/or "(b) comprehensive care, including medical and non-medical services, to private duty clients within their home." (Dkt. 143 ¶ 12; *see also* Dkt. 143-5 at 46, § 11.4(2).) BrightStar's "protected territory" includes a series of zip codes in the Carson City, Nevada area. (Dkt. 143 ¶ 12; *see also* Dkt. 143-5 at 12, § 1.1, and 69.) None of the zip codes in the "protected territory" are in Reno, Nevada. (Dkt. 143 ¶¶ 29-30.) Defendants also agreed not to solicit business from BrightStar

customers for 18 months after the termination of the Agreement. (Dkt. 143 ¶ 13; *see also* Dkt. 143-5 at 46, § 11.4(4).) Both 18-month periods (non-competition and non-solicitation) are tolled for any period in which Defendants are in breach of the Agreement or any other period during which BrightStar seeks to enforce the agreement. (Dkt. 143 ¶¶ 12-13; *see also* Dkt. 143-5 at 46, § 11.4(5).) Defendants also agreed that, upon termination of the Franchise Agreement, they would immediately stop using all telephone numbers affiliated with their BrightStar franchise and would not present or hold themselves out as former BrightStar franchisees. (Dkt. 143 ¶ 14; *see also* Dkt. 143-5 at 54-55, §§ 14.1.1, 14.1.5.)

### d. Non-Reliance Provisions

Section 24 of the Franchise Agreement provides that:

> Franchisee acknowledges that it is entering into this Agreement as a result of its own independent investigation of Franchisor's franchised business and **not as a result of any representations about Franchisor made by its shareholders, officers, directors, employees, agents, representatives, independent contractors, or franchisees that are contrary to the terms set forth in this Agreement**, or in any disclosure document, prospectus, or other similar document required or permitted to be given to Franchisee pursuant to applicable law.

(Dkt. 143 ¶ 22; *see also* Dkt. 143-5 at 66, § 24) (emphasis added). Defendants also executed an addendum to the Franchise Agreement that explains as follows:

> The purpose of this Acknowledgment Addendum is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, and to be certain that you understand the limitations on claims that may be made by you by reason of the offer and sale of the franchise and operation of your business. Please review each of the following questions carefully and provide honest responses to each question.

(Dkt. 143 ¶¶ 23-24; *see also* Dkt. 143-5 at 72, Ex. G.) In capital letters above the signature line at the end of the acknowledgement addendum, it reads: "YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. BY SIGNING THIS ADDENDUM, YOU ARE REPRESENTING THAT YOU HAVE

8

CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS." (*Id.*) (emphasis in original).

In the acknowledgment addendum, Defendants checked "yes" in response to Question 10, which reads, "[d]o you understand that the Agreement and Disclosure Document contain the entire agreement between you and us concerning your BrightStar franchise rights, meaning that any prior oral or written statements not set out in the Agreement or Disclosure Document will not be binding?" (Dkt. 143 ¶ 25; *see also* Dkt. 143-5 at 73.)

### e. Termination and Breach

In January 2017, Stephen Neff notified BrightStar that the website for Peter Morris's Reno franchise (the territory of which was adjacent to Defendants' Carson City franchise) was advertising that the Reno franchise served clients in "Carson City, Minden, Fernley, and Fallon." (Dkt. 147 ¶ 20; Dkt. 147-10.) Neff told BrightStar these areas were part of his franchise's territory. (*Id.*) In March 2017, Neff notified BrightStar that his Carson City franchise had begun caring for two patients who had previously been cared for by Morris's Reno franchise, even though the patients lived in Neff's Carson City franchise's territory. (Dkt. 147 ¶ 21-22; Dkt. 147-12.) Neff also reported that Morris cashed a reimbursement check for one of the two patients after Neff's franchise had taken over her care. (*Id.*) In May 2017, BrightStar notified Neff that because Morris's Reno franchise had been caring for the two patients before Neff's Carson City franchise opened, the patients were "grandfathered in for [Morris] to continue to service per [BrightStar's] Operations Manual." (*See* Dkt. 147 ¶ 24; Dkt. 147-15.)

On July 7, 2017, BrightStar notified Defendants that Defendants defaulted on the Franchise Agreement because they provided services to a client within the adjacent territory belonging to another franchise. (Dkt. 143 ¶ 32.) The notice demanded that Defendants cure the default within

9

30 days by transitioning the account to the neighboring franchise and making a restitution payment of approximately $32,000 to the neighboring franchise. (*Id.* ¶ 33.) Defendants did not make the restitution payment. (*Id.* ¶ 34.) Instead, on October 26, 2017, Stephen Neff emailed BrightStar and said "we are closing our doors as a BrightStar Care effective immediately. We have vacated our premises. I am informed that all clients have successfully transitioned to other care providers." (*Id.* ¶ 35.) Four days later, BrightStar sent Defendants a notice terminating the Franchise Agreement. (*Id.* ¶ 36.) The termination notice reminded Defendants of their obligations under the Agreement not to use BrightStar's confidential information and not to operate a competing business within the specified geographic areas for 18 months. (*Id.* ¶ 37.)

After receiving the termination notice from BrightStar, Defendants continued operating a home health care agency in the Carson City area called Allevia Living. (*Id.* ¶ 38.) Allevia Living provided care, including medical and non-medical services, to clients within their homes. (*Id.* ¶ 39.) Allevia Living serviced patients within the protected territory of Defendants' former Carson City BrightStar franchise. (*Id.* ¶ 40.) Defendants operated Allevia Living from the same office complex and used the same phone number as their former BrightStar franchise. (*Id.* ¶¶ 41-42.) Defendants employed the same nurses and care providers that had worked for their previous BrightStar franchise. (*Id.* ¶ 43.) Defendants also held themselves out as former BrightStar franchisees to BrightStar account partners and other businesses. (*Id.* ¶¶ 44-46.) Defendants operated Allevia Living until at least December 2018. (*Id.* ¶ 47.)

## DISCUSSION

BrightStar now moves for summary judgment against the Neffs and NNC [3] on its breach of contract claim and asks the Court to grant a permanent injunction ensuring Defendants' compliance with certain terms of the Franchise Agreement.

### I.     Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual dispute exists if a reasonable jury could find for either party. *Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012). A material fact is one that affects the outcome of the suit. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). On summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the non-moving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a

---

[3] In its reply in support of its summary judgment motion, BrightStar notified the Court that NNC voluntarily filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Nevada on June 25, 2019 (after BrightStar filed for summary judgment but before briefing was complete). (*See* Dkt. 149 at 1 n.1.) Accordingly, BrightStar indicated that it was no longer seeking summary judgment on its claim against NNC due to the automatic stay provisions of 11 U.S.C. § 362(a), but that it still sought summary judgment against the Neffs individually. However, NNC's Chapter 7 case was closed on February 3, 2020. *See* Final Decree Discharge of Trustee and Closing of Chapter 7 Case, *In re Northern Nevada Care, Inc.*, No. 19-50743-BTB (Bankr. D. Nev. Feb. 3, 2020), ECF No. 16. Because NNC's bankruptcy case is closed, the automatic stay is no longer in effect. *See* 11 U.S.C. § 362(c)(2)(A) ("the stay of any other act under subsection (a) of this section continues until . . . the time the case is closed"); *see also DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 621 n.1 (7th Cir. 2013) ("the automatic stay of actions against the debtor ends at the close of its bankruptcy case") (citing 11 U.S.C. § 362(c)(2)(A)). Because the automatic stay of actions against NNC is no longer in effect, the Court will consider BrightStar's summary judgment motion as to both NNC and the Neffs individually.

11

reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. Breach of Contract

To prevail on its breach of contract claim under Illinois law,[4] BrightStar must show: (1) a valid and enforceable contract exists, (2) it substantially performed the contract, (3) Defendants breached the contract, and (4) damages caused by the breach. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018). BrightStar has met each element. The evidentiary record presented by BrightStar shows that the Franchise Agreement is valid and enforceable and that BrightStar substantially performed under the Agreement. (Dkt. 143 ¶ 21; Dkt. 13 ¶ 18.) The record shows that Defendants breached the Franchise Agreement by operating a competing business within the protected territory of their former BrightStar franchise (Dkt. 143 ¶¶ 12, 38-41), by doing so at the premises of their former BrightStar franchise (*id.* ¶¶ 12, 41), by continuing to use the former BrightStar franchise's phone number (*id.* ¶¶ 14, 42), and by presenting themselves as a former BrightStar franchisees (*id.* ¶¶ 14, 44-46; Dkt. 143-5 at 54, § 14.1.1). Finally, the record shows that Defendants' breaches have harmed BrightStar's brand, its goodwill, its relationships with customers, and its ability to refranchise in the Carson City area. (Dkt. 143 ¶¶ 48-52.)

### a. Fraudulent Inducement Defense

Defendants do not dispute that BrightStar has proved each element of its claim, and they do not try to create a genuine dispute of material fact as to any element. Instead, Defendants argue they were fraudulently induced to enter the Franchise Agreement.

To survive summary judgment based on a fraudulent inducement defense, Defendants must show that: (1) BrightStar made a false statement of material fact; (2) knowing it was false or in

---

[4] The Franchise Agreement contains an Illinois choice-of-law provision (Dkt. 143-5 at 54, § 22) and the parties do not dispute that Illinois law applies to BrightStar's claim.

reckless disregard of its truth or falsity; (3) with intent to induce Defendants to enter into the Franchise Agreement; (4) Defendants reasonably believed the false statement to be true and acted in justifiable reliance on it; and (5) that Defendants were damaged as a result of their reliance on the misrepresentation. *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co., Ltd.*, 707 F.3d 853, 864 (7th Cir. 2013) (applying Illinois law).

Defendants argue they were fraudulently induced to enter the Franchise Agreement based on a number of supposed false statements by BrightStar. Ultimately, each argument fails because Defendants do not produce any record evidence to support their contentions. First, Defendants argue BrightStar told them that their Carson City-area franchise territory belonged solely to them, when in reality the territory contained "several" patients of Peter Morris's neighboring Reno franchise. (Dkt. 147 at 15-16.) According to Defendants, Brightstar had "full knowledge" that Morris was operating in Defendants' territory both before and after Defendants entered the Franchise Agreement. *Id.* Though Defendants do not cite any facts to support this argument, the Court nonetheless reviewed Defendants' statement of facts and it appears only a handful of facts relate to or could arguably support this argument. The Court will examine each one. Defendants contend that a representative from BrightStar sent them a map in May 2015 showing Morris's Reno territory in red and Defendants' proposed Carson City territory in yellow, and "at no time did there appear to be red (Morris' territory) in the yellow (Defendant[s'] territory)." (Dkt. 147 ¶ 11, Dkt. 147-7.) The Court ultimately disregarded this fact for a number of reasons: there is no indication in the record that anyone from BrightStar created the map or sent it to Defendants, the map is undated, and it was submitted to the Court in black and white, making it difficult to make sense of Defendants' color descriptions. Even setting those issues aside, it is not reasonable to interpret a single map, standing alone, as a statement by BrightStar that Defendants' franchise

13

territory did not include any patients being served by a neighboring franchise, as Defendants argue. Defendants also contend that the website for Morris's franchise advertised the fact that it served patients in Defendants' territory. (*See* Dkt. 147 ¶ 18; Dkt. 147-9.) Defendants submit screenshots from Morris's franchise's website which do appear to advertise services in Carson City, but at most, this proves that Morris was operating in Defendants' territory (or was at least trying to) at some point in time. It does *not* prove that BrightStar made any particular promise or false statement of material fact to Defendants, which is an essential element of a fraudulent inducement defense. Other facts that seem to support this argument were disregarded because they did not contain any citations to the record. (*See* Dkt. 147 ¶¶ 14, 19, 31.) Defendants cannot create a triable issue of fact and survive summary judgment without presenting relevant evidence to support their arguments. They have not done so, so this argument fails. *See, e.g., Springer v. Durflinger*, 518 F.3d 479, 484-85 (7th Cir. 2008) (party cannot survive summary judgment without presenting evidence to support its claims, because "summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events") (citation and internal quotation marks omitted).

Next, Defendants argue they were fraudulently induced to enter the Franchise Agreement because BrightStar told Defendants "that the sale of the Carson [City] territory was predicated upon the later sale/assumption of the Reno territory." (Dkt. 147 at 16.) Defendants contend that "BrightStar falsely asserted that the Reno territory would be Defendants['] within 6 months and that the Carson [City] area was just to get them going until the entire region would be Defendants[']." (*Id.*) Again, Defendants fail to cite any facts or evidence to support these assertions. Their statement of facts contains a few proposed facts that seem to support this argument, but like Defendants' previous argument, none of the facts are supported by relevant

14

evidence. (*See* Dkt. 147 ¶ 12, 35.) Defendants do submit evidence showing that before they entered the Franchise Agreement, they negotiated with BrightStar and Morris to purchase Morris's Reno franchise, but that the deal eventually fell through when they could not agree on a purchase price. (Dkt. 147 ¶¶ 3, 7, 9.) Of course, that does not prove that BrightStar told Defendants they would eventually acquire the Reno franchise or that the Franchise Agreement for Defendants to run the Carson City franchise was "predicated upon" Defendants eventually acquiring the Reno franchise as well, as Defendants insist. Other proposed facts that seem to support this argument were disregarded because they did not contain citations to the record. (Dkt. 147 ¶¶ 10, 13, 14, 31.)

Defendants also argue they were fraudulently induced to enter the Franchise Agreement because BrightStar stated that it was an "expert in the skilled care business" and that it had industry-leading software to support Defendants' medical billing and other administrative functions. According to Defendants, that was not true and BrightStar knew all along that its software "could not support the type of skilled care business that Defendants intended to operate." (*See* Dkt. 147 at 15.) Defendants do not cite any facts to support this argument, and the paragraphs in their statement of facts that appear to relate to this argument (*see* Dkt. 147 ¶¶ 15-16) are not supported by citations to the record. Conclusory claims without evidentiary support cannot create a triable issue of fact. *See Springer*, 518 F.3d at 484-85.

Finally, Defendants also point out that BrightStar relies on the testimony of Thomas Gilday to prove its case, and they argue that Gilday "recanted most of his Declaration" at a March 2018 deposition and instead testified in support of Defendants' fraudulent inducement theory. (*See* Dkt. 147 at 15.) According to Defendants, Gilday's supposed recantation creates a genuine dispute of material fact on the issue of breach. But despite a few other references to Gilday's supposedly false testimony throughout their brief, Defendants do not cite any facts or evidence to support this

15

claim (such as Gilday's March 2018 deposition testimony where he allegedly recanted the statements in his declaration) or otherwise develop the argument in any meaningful way. For these reasons, Defendants' argument fails. *See Springer*, 518 F.3d at 484-85.

Because Defendants' fraudulent inducement defense fails, and because BrightStar has met each element of its breach of contract claim, BrightStar is entitled to summary judgment.

## III. Injunction

With the merits resolved, the Court turns to BrightStar's request for a permanent injunction. BrightStar seeks a permanent injunction preventing Defendants from: (1) operating a competing business for 18 months within a defined geographic area; (2) soliciting business from customers of Defendants' former BrightStar franchise; (3) using the phone number associated with Defendants' former BrightStar franchise; and (4) using Confidential Information as defined in the Franchise Agreement; and requiring Defendants to: (5) return Confidential Information, trade secrets, and other property to BrightStar, and (6) file with the Court a written report under oath detailing its compliance with the permanent injunction.

BrightStar is entitled to a permanent injunction if shows that: (1) it has suffered an irreparable injury; (2) legal remedies, such as monetary damages, cannot adequately compensate for that injury; (3) the balance of hardships between the parties warrants an equitable remedy; and (4) a permanent injunction would not harm the public interest. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also, e.g.*, *Entm't One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 955 (N.D. Ill. 2019). BrightStar has satisfied each factor.

First, BrightStar has shown that Defendants violated non-competition provisions of the Franchise Agreement, as discussed above, and "the injuries that flow from the violation of a non-compete are difficult to prove and quantify," making such an injury "a canonical form of

irreparable harm" and making "restrictive covenants prime candidates for injunctive relief." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 666-67 (7th Cir. 2015); *see also Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) (in violations of restrictive covenants, "it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable'"). BrightStar also showed that Defendants' breaches harmed its brand and goodwill, as discussed above. "These type[s] of injuries are presumed to be irreparable because it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001) (internal quotation marks and citation omitted).

Next, the balance of hardships favors the entry of a permanent injunction. Defendants do not identify any hardships they would face from BrightStar's proposed permanent injunction (*see* Dkt. 147 at 12-14), and the Court is not required to speculate as to the harms Defendants might face or make arguments on their behalf. *See, e.g., Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) ("It is not the court's responsibility to research the law and construct the parties' arguments for them."). BrightStar, on the other hand, has identified the irreparable harms discussed above. This makes the Court's balancing task easy. The balance of hardships favors BrightStar and the issuance of a permanent injunction.

Finally, a permanent injunction would not harm the public interest. Again, Defendants do not make any arguments to the contrary, and the Court will not do so on Defendants' behalf. To the extent Defendants' current patients might be harmed if Defendants are forced to stop providing care for them, BrightStar has shown that there are other providers in the Carson City area who can offer the same services. (Dkt. 143 ¶¶ 55-56.) And it is in the public interest to enforce non-competition provisions where, like here, they are "reasonably limited in time and geographical

17

scope." *Preferred Landscape and Lighting, LLC v. Alban*, 162 F. Supp. 3d 746, 752 (N.D. Ill. 2016). For these reasons, the Court grants BrightStar's request and enters a permanent injunction, which is set forth in detail below.

## IV. BrightStar's Attorneys' Fees

The Franchise Agreement provides that if BrightStar incurs costs and expenses to enforce its rights or Defendants' obligation under the Agreement because Defendants fail to comply with the Agreement, Defendants agree to reimburse BrightStar the costs and expenses it incurs, including attorneys' fees. (*See* Dkt. 143 ¶ 19; Dkt. 143-5 at 63 § 19.2.) Accordingly, BrightStar is awarded its attorneys' fees and costs as provided in the Franchise Agreement. BrightStar must file a fee petition within 90 days of the entry of this order. Additionally, the Court previously awarded BrightStar its attorneys' fees in connection with bringing a successful protective order. (Dkt. 162.) BrightStar filed a fee petition as ordered, which Defendants objected to. (Dkt. 163, 164.) BrightStar should include those fees in its forthcoming fee petition so they can be included in the Court's consideration of the final attorneys' fees award. Defendants will have an opportunity to object to BrightStar's forthcoming fee petition. The parties should carefully review Local Rule 54.3, which governs attorneys' fees petitions and requires the parties to "confer and attempt in good faith to agree on the amount of fees or related nontaxable expenses that should be awarded," and sets forth a detailed process for doing so. L.R. 54.3(d).

## CONCLUSION

BrightStar's motion for summary judgment [Dkt. 141] is granted. BrightStar is awarded its attorneys' fees and costs as provided in the Franchise Agreement. Defendants are hereby ordered to:

1. refrain, for a period beginning upon entry of this permanent injunction order and ending 18 months later,[5] from owning, managing, operating, engaging in, or having any interest in any business that provides (a) supplemental healthcare staff to institutional clients, such as hospitals, nursing homes and clinics, or (b) comprehensive care, including medical and non-medical services, to private duty clients within their home, within the following ZIP Codes: 89403, 89406, 89408, 89410, 89413, 89415, 89420, 89423, 89427, 89429, 89430, 89444, 89447, 89460, 89701, 89703, 89704, 89705, and 89706, or within 25 miles of any BrightStar agency (whether franchised or owned by BrightStar or its affiliates);

2. refrain, for a period beginning upon entry of this permanent injunction order and ending 18 months later,[6] from soliciting business from customers of NNC's former Agency or from any National Accounts;

3. cease using the telephone number 775-461-3696 and all other telephone numbers and listings used in connection with the operation of Defendants' former BrightStar Agency;

4. refrain from using any Confidential Information for any purposes;

5. return to BrightStar the Confidential Information, and all trade secrets, confidential materials, and other property owned by BrightStar; and

---

[5] Under the Franchise Agreement at issue, the 18-month period shall be tolled for any period during which Defendants are in breach of the covenant

[6] Under the Franchise Agreement at issue, the 18-month period shall be tolled for any period during which Defendants are in breach of the covenant.

6. file with the Court and serve upon BrightStar and its counsel within ten (10) days after entry of the permanent injunction, a written report, under oath, setting forth in detail the manner in which Defendants have complied with such permanent injunction.

_____
Virginia M. Kendall
United States District Judge

Date: February 11, 2020